AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
WESTERN District of TEXAS

FILED
OCT 0 1 2021
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

United States of America
v.
Marco Antonio Zuniga-Carbajal

)
)
)   Case No. SA-21-MJ-01105
)
)
)
)

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of 08/10/21 to 9/29/21 in the county of Bexar in the Western District of Texas, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 846, 841(a)(1) and (b)(1)(A) | Conspiracy to Possess with Intent to Distribute More Than One Kilogram of Heroin |
| | PENALTIES: 10 Years to Life Imprisonment, $10 Million Fine, 5 Years Supervised Release, $100 Mandatory Special Assessment |

This criminal complaint is based on these facts:

See attached affidavit

☒ Continued on the attached sheet.

CHAD LIGGITT
Digitally signed by CHAD LIGGITT
Date: 2021.09.30 10:11:27 -05'00'

*Complainant's signature*

Chad Liggitt, DEA Special Agent
*Printed name and title*

☐ Sworn to before me and signed in my presence.
☒ Sworn to telephonically and signed electronically.

Date: October 1, 2021

*Judge's signature*

City and state: San Antonio, Texas     Henry J. Bemporad, U.S. Magistrate Judge
*Printed name and title*

## Affidavit

Affiant Background:

I have been employed by the DEA since March 2020 and have been assigned to the DEA San Antonio District Office since November 2020. Prior to my assignment to the DEA San Antonio District Office, I was employed with the Pearland Police Department as a Peace Officer since July of 2007. Between August 2012 and March 2020, I was assigned to the Pearland Police Department, Special Investigative Unit as a Narcotics Investigator. Between November 2015 and March 2020, I was assigned to the DEA Galveston Resident Office as a Task Force Officer. I have assisted in, or initiated numerous federal and state investigations, both national and international, which have resulted in the arrests and convictions of individuals who have smuggled, received, and distributed controlled substances, and which have resulted in the seizure of illegal drugs and proceeds derived from the sales of those illegal drugs. I have been involved in investigations utilizing various types of electronic surveillance, in the execution of federal and state search and arrest warrants, and in the debriefing of defendants, witnesses, and informants, as well as others who have knowledge of the distribution and transportation of controlled substances and the laundering and concealing of proceeds derived from trafficking in controlled substances.

Factual Basis:

In or around August and September 2021, DEA, San Antonio District Office, Task Force Group 2 (D54) was conducting an investigation into heroin trafficking in the San Antonio area. Pursuant to judicial authorization, DEA intercepted a number of telephone calls and text messages to and from a suspected narcotics supplier initially known only as "Tocayo".

For example, on or about August 10, 2021, DEA intercepted a telephone call in which "Tocayo" and another person discussed the delivery of narcotics. "Tocayo asked the other caller to do him a favor and give someone "one" or "one and a half." "Tocayo" told the other caller that this was "just so he can mix it, so he can taste." The parties also discussed how many grams were in an ounce and agreed it was approximately 25 grams. Based on my training and experience, I believe that when "Tocayo" asked the other caller to give someone "one" or "one and a half," he meant that the other caller should give a sample of heroin to a potential customer. I believe that this conversation was about heroin because of the parties' agreement that an ounce was approximately 25 grams. Although a true ounce is approximately twenty-eight grams, I know from my training and experience that heroin traffickers in Texas often use the term "ounce" to mean twenty-five grams in relation to black tar heroin. Finally, when "Tocayo" stated that this delivery was "just so he can mix it, so he can taste," I believe he meant that his potential customer only needed a sample to test for quality before making a larger purchase. Law enforcement officers were able to identify a courier after this telephone call. The courier was detained and found to be in possession of approximately 27.8 grams of black tar heroin.

On September 14, 2021, the DEA intercepted a telephone call in which "Tocayo" and another person discussed the collection of narcotics proceeds. The other caller stated that he/she had 25. "Tocayo" told the other caller to gather up 50 or 60, because it would

not be worth his time to pick up 25. Based on my training and experience, including my knowledge of this investigation, I believe "Tocayo" meant that he wanted to pick up at least $50,000 to $60,000 of narcotics proceeds at once, and that it would not be worth his time or effort if the other caller was only able to pay him $25,000.

On September 20, 2021, the DEA intercepted a telephone call in which "Tocayo" and another person discussed a recent arrest of another person for possession of heroin. During this conversation, the parties used coded language to discuss the arrest, including "the black." Based on my training and experience, along with my overall knowledge of the investigation, I know that "the black" refers to black tar heroin.

On September 27, 2021 the DEA intercepted a telephone call in which "Tocayo" and another person discussed a recent seizure of narcotics proceeds by law enforcement. "Tocayo" asked what kind of police took the money, and further inquired whether the law enforcement vehicles were black or blue. The other caller told "Tocayo" that it was the Sheriffs who took the money, and they were in white trucks. "Tocayo" stated that "they" wanted to know what badge, or agency, took the money. "Tocayo" further stated that others were going to do something and that it would be on the news. Based on my knowledge of the investigation, I know that law enforcement had recently seized narcotics proceeds that were owed to "Tocayo". When "Tocayo" asked about the color of the vehicles, *i.e.* black or blue, I believe he wanted to use that information to determine which law enforcement agency was responsible for seizing the narcotics proceeds he expected to receive. I also know that the colors referred to in this call actually correspond with the colors of marked vehicles used by law enforcement within the Western District of Texas. For example, Texas DPS uses black patrol vehicles; San Antonio PD uses dark blue and white vehicles; and the Bexar County Sheriff's Department uses white patrol vehicles. I further believe that when "Tocayo" referred to doing something that would be on the news, he meant that his associates would retaliate against the agency that seized their narcotics proceeds in a public and significant way.

On September 29, 2021 the DEA intercepted a telephone call between "Tocayo" and another person. "Tocayo" and the other caller agreed to meet for the purpose of delivering narcotics proceeds to "Tocayo". Law enforcement set up surveillance at a gas station located on N. Foster Road, in San Antonio, Texas. At approximately 3:15 p.m., agents saw "Tocayo" meet with a woman, take a black, green and white bag from her, and place the bag into the driver's seat of his vehicle. Agents saw "Tocayo" drive away from the gas station towards his residence. "Tocayo" began to drive erratically. He decelerated before coming to a complete stop in the far right lane of the I-10 feeder road. This type of driving is consistent with counter-surveillance techniques commonly employed by narcotics traffickers. A marked patrol unit stopped the vehicle. After "Tocayo" pulled his vehicle off the roadway, DEA agents and other law enforcement officers detained him, and determined that his name was Marco Antonio ZUNIGA-CARBAJAL.

ZUNIGA-CARBAJAL was advised that the DEA had been investigating him, to include intercepting communications over his cellular phone. ZUNIGA-CARBAJAL was further advised that DEA agents believed that ZUNIGA-CARBAJAL had picked up money from a woman. ZUNIGA-CARBAJAL confirmed that he picked up money and indicated that he had placed the money in the backseat of his vehicle. Agents retrieved a

black, green and white bag from the backseat of ZUNIGA-CARBAJAL's vehicle. Inside the bag was another bag that contained bundles of a large amount of U.S. currency. The total amount of currency seized from ZUNIGA-CARBAJAL's vehicle was approximately $29,000 dollars.

ZUNIGA-CARBAJAL consented to a search of his residence, at XXXX Brighton Park, Converse, Texas. Agents located several bags containing a large amount of United States currency. The total amount of currency seized from ZUNIGA-CARBAJAL's residence is more than $400,000.

I know, based on my training and experience that the wholesale price of black tar heroin can range from thirty thousand dollars to thirty-five thousand dollars per kilogram.

Subscribed and sworn to telephonically on October ___, 2021

CHAD LIGGITT
Digitally signed by CHAD LIGGITT
Date: 2021.10.01 08:18:12 -05'00'

Special Agent
Chad Liggitt, DEA

Henry J. Bemporad
U.S. Magistrate Judge